**CANDIS MITCHELL**
California Bar No. 242797
**FEDERAL DEFENDERS OF SAN DIEGO, INC.**
225 Broadway, Suite 900
San Diego, California 92101-5008
Telephone: (619) 234-8467
Facsimile: (619) 687-2666
Candis_Mitchell@fd.org

Attorneys for Mr. Alfredo Luis-Tenorio

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

**(HONORABLE M. JAMES LORENZ)**

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | Case No. 07CR3162-L |
| ) | |
| Plaintiff, ) | DATE: JANUARY 7, 2008 |
| ) | TIME: 2:00 p.m. |
| v. ) | |
| ) | |
| **ALFREDO LUIS-TENORIO**, ) | STATEMENT OF FACTS AND |
| ) | MEMORANDUM OF POINTS AND |
| Defendant. ) | AUTHORITIES IN SUPPORT OF MOTIONS |
| ) | |

**I.**

**STATEMENT OF FACTS[1]**

It is alleged by the government that on October 21, 2007, U.S. Border Patrol officers were asked to respond to a reported carjacking from the Escondido Police Department When the Border Patrol responded, they found that the person reporting the carjacking, Mr. Alfredo Luis-Tenorio, indicated that Mr. Jesus Munoz, Jr. held him up at gunpoint and forced him to drive a white Chevrolet pickup truck north on I-15.. During the course of the interview, Mr. Luis-Tenorio allegedly revealed that he was responsible for transporting within the United States seven undocumented individuals found lying within the bed of

---

[1.] Unless otherwise stated, the "facts" referenced in these papers come from Government produced discovery that the defense continues to investigate. Mr. Luis-Tenorio does not admit the accuracy of this information and reserves the right to challenge it at any time.

1  the carjacked pickup truck.

2  Mr. Luis-Tenorio was read his Miranda rights which he subsequently waived and allegedly made
3  inculpatory statements.

4  On November 20, 2007, the Government indicted both Mr. Luis-Tenorio and Mr. Munoz for three
5  counts of violating 8 U.S.C. § 1324(a)(1)(A)(ii) (Transporting and Moving Illegal Aliens in the United
6  States).  Mr. Munoz was indicted for an additional charge of Felon in Possession of a Firearm and
7  Ammunition in violation of 18 U.S.C. § 922(g)(1) and 924 (a)(2).

8  These motions follow.

**II.**

**THE INDICTMENT SHOULD BE DISMISSED BECAUSE THE GOVERNMENT DEPORTED FOUR EYE-WITNESSES WHO POTENTIALLY POSSESSED EXCULPATORY EVIDENCE**

The Government alleges that there were seven individuals being brought into the United States illegally in the vehicle driven by Mr. Luis-Tenorio, yet only three material witnesses were detained with Mr. Luis-Tenorio on the day of his arrest. None of the remaining individuals have been retained as witnesses in his case. Instead, they have been deported.

The Government's release and deportation of the material witnesses violates: (1) Mr. Luis-Tenorio's Fifth Amendment right to Due Process; (2) his Sixth Amendment right to Compulsory Process; (3) his Sixth Amendment to confront and cross-examine witnesses; and (4) his right, under Brady v. Maryland, to receive all exculpatory evidence. Through its intentional release and deportation of material witnesses, the Government has effectively prohibited Mr. Luis-Tenorio from hope of receiving a fair trial in this case, and, as a result, the indictment must be dismissed.

**A.  Mr. Luis-Tenorio's Fifth Amendment Right to Due Process and Sixth Amendment Right to Compulsory Process Mandate that He Be Given the Right to Present Witnesses on His Own Behalf at Trial.**

"Few rights are more fundamental than that of an accused to present witnesses in his own defense." Chambers v. Mississippi, 410 U.S. 284, 302 (1973); see also Faretta v. California, 422 U.S. 806, 818 (1975); United States v. Nixon, 418 U.S. 683, 711 (1974); Webb v. Texas, 409 U.S. 95 (1972); Washington v. Texas, 388 U.S. 14 (1967). As the Supreme Court explained in Washington v. Texas, the right to present

1    a defense by presenting one's witnesses "is a fundamental element of due process." <u>Washington</u>, 388 U.S.
2    at 19.
3        Thus, whenever the Government causes the unavailability of some evidence which is material and
4    relevant to the defense, the Government violates the defendant's right to compulsory process guaranteed by
5    the Sixth Amendment. <u>Chambers</u>, 410 U.S. at 302. As the Supreme Court noted in <u>United States v. Nixon</u>,

> The Sixth Amendment explicitly confers upon every defendant in a criminal trial the right "to be confronted with the witnesses against him" and "to have compulsory process for obtaining witnesses in his favor." Moreover, the Fifth Amendment also guarantees that no person shall be deprived of liberty without due process of law. <u>It is the manifest duty of the courts to vindicate those guarantees, and to accomplish that it is essential that all relevant and admissible evidence be produced</u>.

10   <u>Nixon</u>, 418 U.S. at 683 (emphasis added). Consequently, if a particular statute prevents a defendant from
11   calling a witness, or previous effective cross-examination of a witness, that statute has been declared
12   unconstitutional. <u>Washington</u>, 388 U.S. at 14; and <u>Chambers</u>, 410 U.S. at 302.
13        Thus, actions of the Government which make defense witnesses unavailable at trial violate the
14   Mr. Luis-Tenorio's Sixth Amendment rights to compulsory process and Fifth Amendment rights to Due
15   Process. The right to compel the attendance of witnesses, and to offer their testimony at trial, has long been
16   recognized to be at the core of the right to present a defense. <u>Washington</u>, 388 U.S. at 19. As Justice
17   O'Connor stated in her concurring opinion in <u>United States v. Valenzuela-Bernal</u>, "In short, the right to
18   compulsory process is essential to a fair trial." <u>United States v. Valenzuela-Bernal</u>, 458 U.S. 858, 875
19   (1982). The rights protected by the Compulsory Process Clause clearly include the right to present the
20   defendant's version of the facts to the jury so that it may decide where the truth lies. Mr. Luis-Tenorio is
21   denied this crucial right when the Government makes witnesses unavailable.
22        In <u>Valenzuela-Bernal</u>, the Supreme Court held that the deportation or voluntary return of alien
23   witnesses whose testimony would be both "material and favorable" to the defense constitutes a violation of
24   the Compulsory Process Clause of the Sixth Amendment and the Due Process Clause of the Fifth
25   Amendment. <u>Id</u>. The Court stated that sanctions would be appropriate if the defendant "makes a plausible
26   showing that the testimony of the deported witnesses would have been material and favorable to his defense,
27   in ways not merely cumulative to the testimony of available witnesses." <u>Id</u>. at 873.
28

The rationale of Valenzuela-Bernal is that the Government, acting through its Executive Branch, should be allowed to make a good faith determination that a detained witness possesses no evidence favorable to the defense, and following that determination, take steps to return the witness to Mexico rather than hold him or her in custody pending trial. The required showing necessary for sanctions following the release of material witnesses reflects this rationale: Mr. Luis-Tenorio must make some showing that the evidence lost would be "material and favorable" to the defense. Id. at 872. It is not required that a detailed description of the nature of the lost evidence be provided, but only that a "plausible showing" be made that the evidence will be material and favorable.

The Ninth Circuit has created a two-step analysis when dealing with deported witnesses. See United States v. Velarde-Gavarrete, 975 F.2d 672 (9th Cir. 1992); United States v. Dring, 930 F.2d 687 (9th Cir. 1991); United States v. Armenta, 69 F.3d 304 (9th Cir. 1995). The defendant must show that: (1) the evidence lost would be material and favorable to the defense; and that (2) the Government acted in bad faith. Id. Both factors are satisfied in this case.

**1.     The Testimony of the Deported Material Witnesses Would Have Substantially Benefitted Mr. Luis-Tenorio's Defense**.

By deporting the material witnesses, the Government has effectively prevented Mr. Luis-Tenorio from presenting a defense to the charges and allegations. Mr. Luis-Tenorio will be unable to present the testimony of any of the witnesses who could potentially testify that Mr. Luis-Tenorio had no knowledge that they were aliens. Moreover, their testimony might show that these material witnesses were not even illegal aliens. This is material and favorable to the defense.

**2.     The Government Acted in Bad Faith by Deporting the Material Witnesses.**

Because material witnesses were deported by the Government, Mr. Luis-Tenorio is deprived of testimony that is material, favorable, and not cumulative. The testimony of the deported witnesses is crucial to the analysis because there is "a reasonable likelihood that the testimony could have affected the trier of fact." Valenzuela-Bernal at 874. The Government will likely argue that the material witnesses that were retained are representative of what happened when they were arrested with Mr. Luis-Tenorio. However, one or all of the deported witnesses could have potentially countered the Government's allegations. The indictment should therefore be dismissed.

The Government acted in bad faith by depriving Mr. Luis-Tenorio of these witnesses, and thwarted any attempt for Mr. Luis-Tenorio to present a defense. Prior to their deportations, the Government made no attempts to: tape-record any of the exculpatory witnesses or detain any exculpatory witness for deposition or trial. Further, the discovery currently provided by the Government indicates that no effort was made to inform Mr. Luis-Tenorio that the individuals deported could have been required to stay in the United States pending determination of his case. The fact that the Government nonetheless went forward and deported these witnesses without providing Mr. Luis-Tenorio even the opportunity to interview them shows its bad faith. The Government's bad faith continues in its failure to inform Mr. Luis-Tenorio of his right to compel the material witnesses to testify at trial as he objected to their return to Mexico at his arrest. The choice to deport eye-witnesses in this case and retain only the three of them is an act of bad faith, directly compromising Mr. Luis-Tenorio's due process rights.

**B.    The Government's Deportation of Four Material Witnesses Possessing Exculpatory Information Violates the United States Supreme Court's Holding in *Brady v. Maryland*.**

The Constitution prohibits the prosecution from suppressing material evidence in a criminal case. In Brady v. Maryland, 373 U.S. 83 (1963), the Supreme Court held that the suppression by the prosecution of evidence favorable to an accused violates due process where the evidence is material either to guilt or to punishment, irrespective of the good or bad faith of the prosecution. 373 U.S. at 87. As the Court noted in Brady, the purpose of the rule is not to punish prosecutors, but rather to ensure that the defendant receives a fair trial by ensuring that the prosecutor does not assume "the role of an architect of a proceeding that does not comport with the standards of justice, even though, as in the present case, her action is not 'the result of guile.'" Id. at 87-88.

In the present case, the Government has violated the primary dictate of Brady, i.e. disclosure of exculpatory material. By deporting material witnesses prior to Mr. Luis-Tenorio ever having an opportunity to question them, the Government has, in effect, barred Mr. Luis-Tenorio from this exculpatory evidence.

According to the analysis in California v. Trombetta, 467 U.S. 479 (1984), if the evidence was in control of the Government and is lost, dismissal is required if the evidence: 1) "possess[es] an exculpatory value that was apparent before the evidence was destroyed"; and 2) was "of such a nature that the defendant would be unable to obtain comparable evidence by other reasonable available means." In Trombetta, the

1  Supreme Court affirmed the conviction because the defendant was unable to show that he met both of the
2  requested evidence requirements.

3  In contrast, in the present case, Mr. Luis-Tenorio can meet both requirements as stated in <u>Trombetta</u>.
4  The testimony of at least one of the material witnesses was likely to be exculpatory. In addition, the
5  testimony of these material witnesses cannot be obtained from other sources that would be comparable. The
6  witnesses were deported, no statements were taken, and there was no opportunity to depose them.

7  Without the testimony of the material witnesses, Mr. Luis-Tenorio will be unable to refute the many
8  allegations of the Government. Mr. Luis-Tenorio's case satisfies the two prong <u>Trombetta</u> test. The
9  indictment must be dismissed.

## III.

## **MOTION TO DETAIN THE MATERIAL WITNESSES**

12  Title 18, United States Code, section 3144 provides that upon "an affidavit filed by a party that the
13  testimony of a person is material in a criminal proceeding, and if it is shown that it <u>may become</u>
14  <u>impracticable</u> to secure the presence of the person by subpoena, a judicial officer may order the arrest of the
15  person and treat the person in accordance with the provisions of [18 U.S.C.] section 3142 . . . ." (2004)
16  (emphasis added).

17  Mr. Luis-Tenorio requests that the court detain all material witnesses in this case and that the Court
18  treat them pursuant to the provisions of section 3142. Anyone at the scene of the arrest is material to his
19  case. If returned to Mexico, the material witnesses will not be subject to the subpoena power of United
20  States law. For that reason, Mr. Luis-Tenorio requests that any material witness under the Government's
21  control, including those on bond, be detained so that he has the opportunity to interview all persons present
22  at the scene of the arrest.

23  Mr. Luis-Tenorio knows that four material witnesses have been returned to Mexico. Mr. Luis-
24  Tenorio respectfully requests the Court order the Government to detain any of the material witnesses who
25  attempt to reenter the United States so that he may question them regarding their knowledge in this case.

## IV.

## **MOTION TO SEQUESTER MATERIAL WITNESSES**

Mr. Luis-Tenorio respectfully requests this Court sequester the material witnesses so that they may not converse with each other concerning the facts and details of this case nor meet with their common attorney as a group to discuss or plan their testimony.

The purpose of the rule permitting seclusion of witnesses is to "prevent witnesses from matching narratives." <u>Witt v. United States</u>, 196 F.2d 285 (9th Cir. 1952), cert. denied 344 U.S. 827 (1952). A sequestration order serves both to "reduce danger that witness' testimony will be influenced by hearing testimony of other witnesses and to increase likelihood that witness' testimony will be based on her own recollections." <u>United States. v. Hobbs</u>, 31 F.3d 918, 921 (9th Cir. 1994) (citing <u>Perry v. Leeke</u>, 488 U.S. 272, 281-82 (1989); 3 Jack B. Weinstein & Margaret A. Berger, <u>3 Weinstein's Evidence</u>, ¶ 615[01], at 615-1 (1994)). Sequestration of witnesses is "a time-honored practice[2] designed to prevent the shaping of

---

[2] The best known example of the sequestration of witnesses comes from the story of Susanna's trial for adultery:

In the Story of Susanna a Hebrew wife is falsely accused by lecherous voyeurs. As she bathes alone in her garden, two lusty elders secretly observe the her. When she makes her way back to her house, they accost her, threatening to claim that she was meeting a young man in the garden unless she agrees to make love to them. She refuses to be blackmailed, and is arrested and about to be put to death when a young man named Daniel interrupts the proceedings. After separating the two men, they are questioned about details of what they saw, but disagree about the tree under which Susanna supposedly met her lover.

The first says they were under a mastic, the second says they were under a holm tree. The great difference in size between a mastic and a holm makes the elders' lie clear.
<u>The Story of Susanna</u> in <u>The Apocrypha: Or Non-Canonical Books of the Bible 1936</u>, 246-48 (Manuel Komroff ed., 2004).

A similar story appears in the Dhamma that, a source of Hindu law dating back to 1100 A.D. Parties would travel great distances to a remote village to have their disputes heard by a boy known for his wise decisions. One dispute involved a claim by three beggars that a fourth, to whom they had temporarily entrusted silver coins, had stolen money. In his defense, the accused beggar claimed that a wild dog had run off with a handkerchief in which the coins were wrapped. Four witnesses, with whom the beggar had actually divided the funds, testified that they observed the wild dog abscond with the handkerchief. The wise young boy then instructed the witnesses to "go to a distance of four separate places." He asked the first witness, "[I]n what direction the dog had run, and what was his color." The witness replied that he saw a white dog which ran east. The second witness, having been prevented from hearing the answer of the first, testified that he observed a red dog running south. Similarly, the third swore that a black dog ran west, and the fourth that a spotted dog ran north. The boy proclaimed, "'They have conspired to cheat, and concealed the money ...' [and] he caused them to dig [the money] up from where it was hid and return the full amount ...."

testimony by hearing what other witnesses say." Taylor v. United States, 388 F.2d 786, 788 (9th Cir.1967) (citing Charles v. United States, 215 F.2d 825, 827 (9th Cir. 1954); 6 Wigmore, Evidence § 1837-39 (3d Ed. 1940)).

Given the danger of tailoring – increased by the likelihood that the material witnesses will have the opportunity to meet with each other as a group because they share a common attorney – sequestration is necessary. Additionally, this order should not be limited to witness-to-witness contact. Rather, it should be expanded to encompass prevention of information given by one material witness to their common attorney being disseminated to other material witnesses. Allowing the material witness attorney to inform one material witness of another material witnesses' testimony poses the exact same risk as allowing one witnesses to speak to another. If the attorney is permitted to convey the same information that a material witness would not be allowed to obtain from another source, then the sequestration order would effectively be nullified.

It is not presumed by the request for this order that the material witness attorney would encourage the material witnesses to testify falsely. However, false testimony is not always intentional: a witness with a hazy or incomplete recollection may be unconsciously influenced by hearing the proposed prior testimony[3] of another material witness. Where a sequestered witness to testify falsely, the fact that they did not conform the testimony to that of earlier witnesses increases the likelihood that inconsistencies will emerge.[4]

---

John H. Wigmore, A Panorama of the World's Legal Systems, 230-32 (1928).

[3] A clear explanation of this phenomenon appears in an early American case: "The witness in an excited litigation often becomes the mere partisan of the litigant whose cause he represents.... [He often] lapses into the conviction that the scene before him is a mere tilt and tourney in which he enters to overturn and countervail the testimony of the adverse party. He has heard the evidence of his own party in regard to the transaction, and, perhaps he remembers it somewhat differently; but a conflict would be fatal; and he often reasons his flexible conscience into the opinion that his own memory is at fault, and the statement of his confederate is the true version; and he therefore corroborates it. He has heard the testimony of the adverse party, and his ingenuity is taxed at once to strike it where it is vulnerable, and destroy it. A brief and whispered conference behind the bar, and he finds one of his own party who saw the transaction as he saw it; and the thing is done." Rainwater v. Elmore, 48 Tenn. 363, 365 (1870).

[4] In addition, "exclusion may also enable defense counsel to show that prosecution witnesses are telling identical stories in identical language, greatly discrediting them in the eyes of the jury." 5 Am. J. Trial Advoc. § 58 at 87 (1966); see also Charles W. Fricke, Planning and Trying Cases, 251-52 (1952) ("Of course, art reflects life, or at least the principles of cross-examination: 'You must know better than I do,

Sequestration is "simple and feasible" and "so powerful and practical," so much so that no contingency justifies its denial. 6 Wigmore, Evidence § 1839 (Chadbourn rev. ed. 1976). If perjury is contemplated, sequestration is "almost the only hope" of an innocent opponent. Id. And because no one, including judges, can know whether sequestration is needed, a party who thinks he needs it "must be allowed to have the benefit of the chance" Id.

**A.     Sequestering the Three Material Witnesses is Provided for Under Federal Rules of Evidence 615 and Warranted Based Upon the Facts of the Case**

Rule 615 of the Federal Rules of Evidence requires – subject to certain exceptions – a trial court to exclude witnesses so that they cannot hear the testimony of other witnesses upon the request of a party. Fed. R. Evid. 615. The purpose of Rule 615 is to encourage truthful and independent testimony by lessening the chance that a witness will be subtly or even subconsciously influenced by listening to what others say, and by removing temptations or opportunities for witnesses to deliberately shape their testimony in light of what others say. Although the order for sequestration is generally given at the beginning of the trial, it may be ordered at any time. See e.g. State v. Lea, 84 So.2d 169, 172 (La.. 1955), cert. denied Lea v. State of Louisiana, 350 U.S. 1007 (1956). Such segregation discourages and exposes fabrication, inaccuracy, and collusion – especially in a case such as this one where all three witnesses share the same attorney and who would likely be discussing material facts at issue in the case at the same time.

The district courts possess considerable discretion to fashion orders pertaining to sequestration. United States v. Oropeza, 564 F.2d 316 (9th Cir. 1977), cert. denied, 434 U.S. 1080 (1978); Witt v. United States, 196 F.2d 285 (9th Cir. 1952), cert. denied 344 U.S. 827 (1952). And despite the narrowness of the text of Rule 615, trial courts are free to broaden the scope of their orders beyond courtroom exclusion. See United States. v. Sepulveda, 15 F.3d 1161, 1176 (1st Cir. 1993) ("[T]he rule demarcates a compact procedural heartland, but leaves appreciable room for judicial innovation beyond the perimeters of that which the rule explicitly requires.") (citing United States v. De Jongh, 937 F.2d 1, 3 (1st Cir.1991)).

---

Inspector, how very rarely two people's account of the same thing agrees. In fact, if three people were to agree exactly, I should regard it as suspicious. Very suspicious, indeed.'") (quoting Agatha Christie, Spider's Web, 56 (1956)).

1    In addition to exclusion, Rule 615 allows this court to take further measures of separation designed to prevent communication between witnesses, such as ordering them to remain physically apart, ordering them not to discuss the case with one another or with any other person and ordering them not to read a transcript of the trial testimony of other witnesses. See e.g. United States v. Buchanan, 787 F.2d 477, 485 (10th Cir. 1986) (Rule 615, while not explicitly stating so, includes within it a prohibition against witness to witness communication out of court—witnesses should be clearly instructed that they "are not to discuss the case or what their testimony has been **or would be** or what occurs in the courtroom with anyone other than counsel for either side.") (emphasis added).  Such measures extend to such possibilities as ordering them to remain physically apart or ordering them not to discuss the case with one another. See e.g. United States. v. Ortiz, 10 F.Supp.2d 1058, 1059 (N.D. Iowa 1998) ("[C]ounsel were to instruct their witnesses not to read any news stories or articles about the case, or about anyone involved with it, or listen to any radio or television reports about the case or about anyone involved with it; that counsel were to instruct their witnesses that until the trial is concluded they should not talk with or speak to any of the parties, or witnesses involved in this case; that the lawyers, the parties, and their agents are precluded from relaying information to witnesses about the nature and content of testimony or physical evidence that has been presented at trial; and that all witnesses be excluded, except the parties and the government's case agent, from the courtroom during the trial."); United States v. Arias-Santana, 964 F.2d 1262, 1266 (1st Cir.1992) (citing Geders v. United States, 425 U.S. 80, 87 (1976) ("In addition to ordering their exclusion from the courtroom, the trial court has broad discretion to direct witnesses not to discuss their testimony outside the courtroom."); United States v. Greschner, 802 F.2d 373, 375 (10th Cir.1986) (holding that Rule 615 prohibits discussion of the case between witnesses) cert. denied 480 U.S. 908 (1987); United States ex rel. Clark v. Fike, 538 F.2d 750 (7th Cir.1976), cert. denied 429 U.S. 1064 (1977) (suggesting that a separation order may issue as to the conduct of witnesses prior to trial).

As Rule 615 allows the district court discretion in shaping a sequestration order this court should exercise the rule to prevent the material witnesses in this case from discussing proposed testimony with each other or with their attorney as a group.

**B.    Failing to Sequester Witnesses Would Violate Mr. Luis-Tenorio's Right to Confrontation of Witnesses**

As the Supreme Court observed in Coy, the right of confrontation "'comes to us on faded parchment,' . . . with a lineage that traces back to the beginnings of Western legal culture." Coy v. Iowa, 487 U.S. 1012, 1015 (quoting California v. Green, 399 U.S. 149, 174 (1970) (Harlan, J., concurring)). The Confrontation Clause guarantees a criminal defendant the right to cross-examine the witnesses against him and it is of is particular importance when the witness is critical to the prosecution's case. "[I]t is well-established that any significant diminution of the right to confrontation puts into doubt the integrity of the trial." Chambers v. Mississippi, 410 U.S. 284 (1973). This right to confrontation is of importance because "[w]hether rooted directly in the Due Process Clause of the Fourteenth Amendment, or in the Compulsory Process or Confrontation clauses of the Sixth Amendment, the Constitution guarantees criminal defendants 'a meaningful opportunity to present a complete defense.'" Crane v. Kentucky, 476 U.S. 683, 690 (1986) (quoting California v. Trombetta, 467 U.S. 479, 485 (1984)) (citations omitted).

To be consistent with the Constitutional right of confrontation, an accused must be permitted to undertake some meaningful cross-examination of prosecution witnesses. Springer v. United States, 388 A.2d 846 (D.C. App. 1978). And this right to confrontation can be violated even though a witness is physically present and can be subjected to at least some examination. See Davis v. Alaska, 415 U.S. 308 (1974); see also Dorsey v. Warden, 523 F.2d 590 (6th Cir. 1975). This is so because an accused is entitled to a personal examination of the witness, and this envisions an opportunity to test the recollection or conscience of the witness. See Ohio v. Roberts, 448 U.S. 56 (1980). Here, if the witnesses are permitted to confer with each other and plan their testimony together as a group in advance of trial this right to true confrontation would be diluted as a cross-examination would not be of a witnesses' independent recollection but rather that of the collective. Thus, the right of confrontation is denied even though some cross-examination was possible. See United States v. Miranda, 510 F.2d 385 (9th Cir. 1975); United States v. Jordan, 466 F.2d 99 (4th Cir. 1972).

In order to avoid a denial of a meaningful opportunity to conduct cross-examination the witnesses must be sequestered. Any opportunity for the witnesses to confer as a group in preparation for their trail testimony would thwart Mr. Luis-Tenorio's chance to have a true possibility to confront the witnesses as to their recollection of the events leading up to his arrest.

## V.
## CONCLUSION

For the foregoing reasons, Mr. Luis-Tenorio respectfully requests that the Court grant the above motions.

                                        Respectfully submitted,

Dated: December 12, 2007        *s/ Candis Mitchell*
                                        **CANDIS MITCHELL**
                                        Federal Defenders of San Diego, Inc.
                                        Attorneys for Mr. Luis-Tenorio
                                        Candis_Mitchell@fd.org